# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN – NORTHERN DIVISION

EBONY HENDRIX, KELLY SPILLER,
AND FELICIA MCDANIEL,

                    Plaintiffs,

v.

CALVIN AKIN, PREMIER REAL ESTATE
MANAGEMENT, LLC, PREMIER
SAGINAW, I LLC AND, ORKIN, LLC,

                    Defendants.

Case No. 1:15-cv-12364

Hon. Thomas L. Ludington

_____/

## REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT PURSUANT TO FRCP 12(b)(6)

## I.   Plaintiffs' Threadbare Recitation of the RICO Elements does not Satisfy the FRCP 12(b)(6) Plausibility Standard

RICO's purpose is to target activity performed as part of an ongoing criminal organization, and to allow for the leaders of criminal syndicates to be tried or civilly prosecuted for the crimes they ordered or assisted others in carrying out. The statute was not enacted either to allow for a run-of-the-mill bed bug claim to be brought in federal court under the guise of a federal question, or so that overly zealous claimants might attempt to publically shame civil defendants with outrageous allegations of criminal activity.   It is precisely because of the dire nature of a RICO claim, "the 'opprobrium' and exposure to treble damages", that Sixth Circuit precedent routinely admonishes trial courts to "eliminate frivolous RICO claims at the earliest stage of litigation." *DIRECTTV, Inc. v. Cavanaugh*, 321 F.Supp.2d 825, 839 (E.D.Mich. 2003).

Categorically fatal to the subject RICO count, for a complaint to survive a Rule 12(b)(6) motion to dismiss "the plaintiff must plead sufficient factual matter to render the legal claim plausible, *i.e.* more than merely possible." *Fritz v. Charter Twp. Of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010).   As Sixth Circuit trial courts have aptly quoted the U.S. Supreme Court's opinion in *Iqbal*:

> Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility.  Making a determination of plausibility is a context-specific task that requires the reviewing court to draw on *its judicial experience and common sense*.  However, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.

1

> ***Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.***

*Ross v. Michigan State Univ. Bd. Of Regents*, 837 F.Supp. 2d 712, 716 (W.D.Mich. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009)) (emphasis added). In other words, Plaintiffs' obligation to plead "grounds" for their claimed entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The factual allegations must "raise a right to relief above the speculative level." *Id.*

The allegations of Plaintiffs' RICO count, when properly stripped of their hyperbole and rhetoric, comprise nothing more than a threadbare recital of the claim's elements falling woefully short of the line separating possible from plausible. The pleadings do not set forth allegations either of the existence of a racketeering enterprise or a pattern of racketeering activity on which to maintain a plausible 18 U.S.C. § 1962(c) or (d) based RICO claim. Accordingly, the Rule 12(b)(6) standard of review, necessarily incorporating this Court's <u>judicial experience and common sense</u>, compels that Plaintiffs' RICO claim be dismissed as devoid of credible factual substance to support the "plausibility" requirement of *Iqbal* and *Twombly*, and that the action be remanded to state court.

## II.   Plaintiffs Fail to Allege Plausible Facts Regarding Either the Existence of or the Defendants' Participation in a "Racketeering Enterprise"

Defendants' initial brief on the instant motion demonstrates that Plaintiffs

have failed to plead a RICO "enterprise's" existence where: (i) a RICO defendant must be sufficiently alleged to have "conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs." *Reeves v. Ernst & Young*, 507 U.S. 170, 185 (1993) (emphasis in original).

Contrary to both Rule 12(b)(6)'s requirement that sufficient factual matter be pleaded to render a legal claim plausible, and a RICO claimant's obligation under § 1962(c) to plead sufficient allegations to establish that a defendant conducted or participated "directly or indirectly, in the conduct of [a RICO] enterprise's affairs", Plaintiffs' complaint does not contain a single allegation regarding any particular activity supposedly undertaken either by Defendant Calvin Akin or by Defendant Premier Saginaw, I LLC. *See* Complaint (Ex. A to Motion), *generally*. Rather, the only non-jurisdictional allegation to even mention these Defendants states nothing more than that "Calvin Akin and Premier Saginaw I, LLC direct the enterprise." *Id.*, ¶ 51(a). This represents the very textbook model of a vague, ephemeral, threadbare and conclusory recital insufficient to support a RICO claim. Plaintiffs accordingly have not pleaded the Defendants' participation in a RICO enterprise, and therefore have not pleaded the existence of an enterprise.

Defendants' initial brief further establishes that "[u]nder the 'non-identity' or 'distinctness' requirement, a corporation may not be liable under [§] 1962(c) [or (d)] for participating in the affairs of an enterprise that consists only of its own

subdivisions, agents, or members." *Begala v. PNC Bank, Ohio, Nat. Ass'n*, 214 F.3d 776, 781 (6th Cir. 2000). Indeed, Defendant Premier Real Estate Management, LLC ("PREM") is the landlord signatory to Plaintiffs' leases, and as discussed above, is the <u>only</u> party actually alleged to have conducted any activity with respect to the administration of Plaintiffs' leases and the engagement with Defendant Orkin to perform extermination services. *See* Complaint, ¶¶ 25-37. Under binding precedent, PREM cannot join with its own employees or agents to undertake regular corporate activity and thereby become "an enterprise distinct from itself." *Begala*, 214 F.3d at 781. And with respect to Orkin, not only have Defendants shown that the pleadings contain no allegation that Orkin "took direction" from the non-Orkin Defendants sufficient to predicate a racketeering relationship, but any suggestion that a Wisconsin real estate management entity controlled the affairs of a nationally recognized pest control service would traverse the bounds of plausibility into the realm of the preposterous.

In response to the foregoing showing, Plaintiffs cite to *West Hills Farms, LLC v. ClassicStar Farms, Inc.*, 727 F.3d 473 (6th Cir. 2013) – a case that is completely inapposite from and has no bearing on this scenario whatsoever. *ClassicStar* represented a unique instance where the RICO claimant not only intricately pleaded, but demonstrated on a Rule 56 summary judgment motion, a complex structure whereby a corporate defendant was distinct from the RICO

enterprise because it "dominated and controlled" its subsidiary participants in such a way that it "use[d] the separately incorporated nature of its subsidiaries to perpetuate a fraudulent scheme." *ClassicStar*, 727 F.3d at 493. By contrast, in this case the pleadings contain neither allegations particularizing any "domination or control" by any one Defendant over any other, nor allegations particularizing any distinct role either by Mr. Akin or by Premier Saginaw I, LLC as required by *Iqbal*. Instead, when stripped of their bombast, the pleadings allege merely that PREM alone engaged Orkin to remedy infestations that arose in Plaintiffs' units, and then required reimbursement from Plaintiffs under the terms of their leases.

## III.   The Premise for Plaintiffs' Allegations of "Racketeering Activity" is Belied by the Lease Contracts Incorporated in their Own Pleadings

The lease contracts are quoted, incorporated by reference and attached to Plaintiffs' own First Amended Complaint as Exhibits 2-4, and demonstrate that Plaintiffs have not alleged the essential elements of "conduct" comprising "a pattern of racketeering activity" on which to maintain a plausible RICO claim. Contrary to Plaintiffs' contention that it is improper for Defendants to invoke the terms of the lease contracts in a Rule 12(b)(6) motion, the Sixth Circuit has repeatedly recognized that courts may consider items appearing in the record of the case, including exhibits to pleadings "referred to in the complaint and … central to the claims contained therein," without converting a Rule 12(b)(6) motion to one for summary judgment under Rule 56. *Rondigo, L.L.C. v. Twp. Of Richmond*, 641 F.3d

673, 681(6th Cir. 2011) (quoting *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008)). A court may treat such a document as "part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). Likewise, a "court may disregard allegations in the complaint if contradicted by facts established by exhibits attached to the complaint." *Sumner Peck Ranch v. Bureau of Reclamation*, 823 F.Supp. 715, 720 (E.D. Cal. 1993).

The entire premise underlying Plaintiffs' theory of a racketeering scheme begins with the contention that there was an existing bed bug infestation in their units, and that PREM was aware of the purported infestation, i.e. the allegation that "[p]rior to Plaintiffs taking occupancy, Defendant [sic] knew or should have known that the premises were infested with bedbugs." Complaint, ¶ 23. Not only would the Court be justified in deeming this allegation implausible on its face, but the allegation is disproven by the leases themselves, which, as quoted in Paragraph No. 21 of the pleadings, each contain Plaintiffs' own certification that "[t]he premises are conclusively presumed to be in good condition at move-in, unless Tenant specifies objections on [the move-in inventory checklist] and returns a copy of it to Landlord within seven (7) days." **Ex. A**, Leases. Where the pleadings accordingly reflect that the demised premises had no bed bug infestation at the inception of each tenancy, the alleged basis for Plaintiffs' theory of "a pattern of

racketeering activity," i.e. that PREM leased premises with known infestations, has not been set forth such that a plausible RICO claim can be maintained.

Likewise, the lease contracts attached to and incorporated in the pleadings contain Plaintiffs' express covenants to cover the cost of abatement of unsanitary conditions in their units, including that: (i) "Tenant shall use and maintain the Premises in accordance with applicable police, sanitary, and all other regulations imposed by governmental authorities"; (ii) "Tenant also shall maintain the Premises in a neat and orderly manner"; and (iii) "Tenant agrees ... to indemnify, hold harmless and defend Landlord ... from all damages, loss ... or liability that results from Tenant's negligent or improper use of the Premises ... ." Indeed, both the pleadings and Plaintiffs' response to the instant motion make clear that it is precisely the contracts' imposition of responsibility on Plaintiffs to pay for bed bug extermination in their units by virtue of these terms which comprises the alleged "predicate offense" underlying Plaintiffs' RICO claim. *See* Mot. Resp., pp. 10-12. That is, where the contracts (and therefore the pleadings themselves) leave no question that Plaintiffs agreed to pay for these services, Plaintiffs only contention is that the inclusion of such contractual obligations constitutes a violation of a landlord's duty to keep a building "free from vermin" under MCL 125.474 of the housing statute. Complaint, ¶ 29; *see also* Mot. Resp., pp. 10-11.

Again however, "the tenet that a court must accept as true all of the

allegations contained in a complaint [under Rule 12(b)(6)] is inapplicable to legal conclusions" (*Iqbal*, 556 U.S. at 679), and Plaintiffs' allegations regarding the operation of MCL 125.474 under these circumstances (i.e., that "under [MCL 125.474], the landlord – not a tenant – has a statutory duty to keep the premises free from bed bugs") are demonstrably false legal conclusions.  To the contrary, and entirely consistent with the lease terms requiring Plaintiffs to maintain their units "in accordance with applicable … sanitary, and all other regulations imposed by governmental authorities", the operative provision of MCL 125.474 explicitly mandates that "***tenants shall be responsible for the cleanliness of those parts of the premises that they occupy and control.***" (emphasis added).   Notably, Plaintiffs' fail to cite a single instance in which a Michigan court recognized an absolute duty on the part of a landlord to take responsibility for a bed bug infestation in a tenant's unit either under statute or any common law theory, and no such authority is known to exist.  Accordingly, for the additional and alternative reason that Plaintiffs have failed to allege predicate unlawful acts comprising "a pattern of RICO activity," the claim should be dismissed under Rule 12(b)(6).

JAFFE RAITT HEUER & WEISS, P.C.

By:   /s/ George A. Sumnik
George A. Sumnik (P41291)
David Z. Adler (P71227)
*Attorneys for Non-Orkin Defendants*
27777 Franklin Road, Suite 2500
Southfield, MI 48034
Dated:  November 4, 2015          248-351-3000



1

### RESIDENTIAL LEASE RENEWAL
### CROSSINGS AT BUENA VISTA Phase I
### SAGINAW, MICHIGAN

THIS RESIDENTIAL LEASE ("Lease") is made effective as of February 1, 2015 between THE CROSSINGS AT BUENA VISTA, LIMITED DIVIDEND HOUSING ASSOCIATION LIMITED PARTNERSHIP, a Michigan limited partnership (the "Landlord"), whose address for purposes of this Lease is 19105 W. Capital Drive, Suite 200, Brookfield, Wisconsin, and Ebony Hendrix individually and collectively (the "Tenant"). Landlord, in consideration of the rents to be paid and the covenants to be performed by Tenant, does hereby lease to tenant, and Tenant herby leases from Landlord, apartment unit #8 in the building located at 3688 Hess Ave., THE CROSSINGS AT BUENA VISTA, Saginaw, Michigan. ("the Premises").

### COVENANTS

1.      **DESCRIPTION AND CONDITION.** Landlord rents to Tenant the Premises. The Premises are not furnished. Tenant acknowledges that it has received a move-in inventory checklist. The Premises are conclusively presumed to be in good condition at move-in, unless Tenant specifies objections on that list and returns a completed copy of it to Landlord within seven (7) days after receiving the list. The move-in inventory checklist is not a request for repairs.

2.      **TERM AND POSSESSION.** This Lease begins on February 1, 2015 and runs through February 28, 2015. Possession will not be provided until the first month's rent and Security Deposit are paid. If the Premises are not ready on the date this lease commences, the sole damage for which Landlord shall be liable to Tenant is the full abatement of Tenant's prorated rent from the date this lease commences to the date the Premises are ready for occupancy, which date is at Landlord's exclusive determination. If Tenant does not take possession on the day it is to be provided, and Tenant has not given Landlord written notice that it will take possession on a later day, Landlord may presume conclusively that Tenant has abandoned the Premises and Landlord may re-rent the Premises. There shall be no more than (2) occupants living in the Premises during the tenancy. Tenant will be charged a penalty of $100.00 per month for each occupant exceeding that number. Only the following named resident may occupy the apartment: **Ebony Hendrix, Jeremiah Hendrix(m).**

3.      **RENT.** Tenant shall pay Landlord total rent for the term of 1 month. Rent shall be paid in equal monthly installments of $569.00 due on the first day of each month, beginning with the second month (the first month will be collected before move-in). If the rent is not paid by the first day of the month, then an additional $50.00 paperwork processing fee shall be added to the rent owing for that month. Landlord may require installments to be paid with certified funds or money orders and in a single payment. Rent is considered paid only when actually received by Landlord.

4.      **PLACE OF PAYMENT AND NOTICES.** Notices to Tenant shall be delivered or sent to the Premises. Payment of rent or other charge due from Tenant and notices to Landlord shall be delivered or sent to Premier Real Estate Management, LLC, 19105 W. Capital Drive, Suite 200, Brookfield, Wisconsin 53045. Notices required by this lease or by law shall be in writing. Notices that are mailed (including security deposit notices) are deemed received by the other party on the next regular day for delivery of mail after being stamped with sufficient postage and deposited in a United States mailbox. A 60 Day Notice of intent to vacate must be given in writing to the above address on or before the first of the month, including a forwarding address.

5.      **SECURITY DEPOSIT.** Tenant shall pay a $99.00 security deposit before receiving possession. The deposit, or any portion of it that is returned, shall be returned in a check, payable to all Tenants, or may be returned entirely to one Tenant if all other Tenants have so authorized Landlord in writing. Security Deposit Act communications shall be addressed to Landlord at the address in paragraph 4. Tenant may not elect to use the deposit for rent.

6.      **DEFAULT AND REMEDIES.** Tenant's noncompliance with any covenant of this Lease is a default. If Tenant defaults, Landlord may pursue all remedies legally permitted, including termination of this tenancy. On seven days written notice, Landlord also may terminate this tenancy if Tenant, a member of Tenant's household, or other person under Tenant's control unlawfully manufactures, delivers, possesses with intent to deliver, or possesses a controlled substance on the Premises. Recovery of the Premises by the Landlord shall not relieve the Tenant of any obligation under this Lease, and upon default, Landlord shall be permitted to accelerate the rent due throughout the term of this Lease and demand immediate payment thereof. Tenant shall reimburse Landlord for all legal fees, costs, and expenses legally recoverable and for all damages caused by its default, including costs of re-renting the Premises and all rent for the remainder of the term and succeeding terms that Landlord does not collect through mitigation. If other Premises owned or managed by Landlord are available for lease, it shall not be unreasonable for Landlord to lease them before Tenant's Premises. From the date of execution, time is of the essence of this lease. If Landlord terminates this tenancy, it may cancel, by written notice, any renewal, lease extension, or lease for a future term that Landlord and Tenant have executed.

{B0000302\DT209872.DOC;1}

EXHIBIT

C

2

7. **UTILITIES.** Tenant shall put utilities for the Premises into its name, maintain uninterrupted service throughout the Term, and timely pay all utility bills, including heat and electricity. Range and refrigerator supplied by landlord. Tenant shall pay any penalties imposed by utility providers because of late payment of original bills that are Tenant's responsibility to pay. Tenant shall maintain a reasonable amount of heat in cold weather to prevent damage to the Premises (i.e., prevent frozen water pipes). Tenant shall be responsible for any and all damages to the Premises that arise from its failure to comply with this requirement.

8. **LATE FEES AND DISHONORED CHECKS.** In addition to late fees described in Section 3, Tenant shall pay Landlord $25.00 for any check to Landlord that is dishonored.

9. **CHRONIC LATE PAYMENT OF RENT.** Rent is due on the first day of each month, and not withstanding Section 8, Landlord may terminate this Lease because Tenant is chronically late in rent. Chronic late payment is defined as paying rent after the due date on three or more occasions during this Lease.

10. **APPLICATION OF MONEY FROM TENANT.** Money received by Landlord from Tenant or on its behalf shall be applied to Tenant's account as follows: first to satisfy unpaid late fees, dishonored check fees, and to other fees owed by Tenant; second to maintenance and repair costs chargeable to Tenant; third to legal fees and court costs legally chargeable to Tenant, including costs incurred prior to curing a default, fourth to outstanding utility bills that are the responsibility of Tenant; fifth to deposits or portions thereof due from Tenants and sixth to rent. Restrictive endorsements on a check or statements in any communication, including those accompanying a payment, shall not constitute an accord and satisfaction or amend this provision.

11. **KEYS.** Landlord may retain a key to the Premises throughout the Lease. Tenant shall not change the locks without Landlord's prior written consent, and Tenant shall immediately provide Landlord with a key to any new lock if the locks are changed. Landlord may charge Tenant a reasonable amount for replacing lost keys and for assisting Tenant in gaining entry to the Premises.

12. **ENTRY BY LANDLORD.** Landlord or its agents may enter the Premises in an emergency or to perform repairs, maintenance, code inspections, appraisals, insurance inspections, other purposes reasonably related to the operation of the building, and to show the Premises for lease. Except during an actual or apparent emergency, all entries shall be made during reasonable hours; and Landlord shall make reasonable efforts to inform Tenant of its intention to enter and shall attempt to establish a mutually acceptable time.

13. **MAINTENANCE.** Tenant shall use and maintain the Premises in accordance with applicable police, sanitary, and all other regulations imposed by governmental authorities. Tenant also shall maintain the Premises in a neat and orderly manner. Tenant will observe all reasonable regulations and requirements of underwriters concerning use and condition of the Premises tending to reduce fire hazard and insurance rates. Tenant shall pay for the repair of all damage to the Premises and structure of which it is a part, including fire and flood damage, caused by Tenant, its guests or invitees; they shall reimburse Landlord for all permit, inspection, and certification costs it incurs because of their noncompliance with this lease or applicable laws; and they shall reimburse Landlord for all damages resulting from not reporting the need for repair or maintenance in a reasonably timely manner. Nothing in this clause shall waive or lessen Landlord's obligation to maintain and repair the Premises under Michigan law, but Landlord is not liable for any loss that accrues to Tenant because of Landlord's actions in reasonably fulfilling its obligations hereunder.

14. **INDEMNIFICATION.** Tenant agrees for Tenant and Tenant's heirs, and personal representatives, to indemnify, hold harmless and defend Landlord and Landlord's management company from all damages, loss, including lost rents, or liability that results from Tenant's negligent or improper use of the Premises and common areas in the apartment complex and from Tenant's or any guest of Tenant's intentional misuse of them.

15. **INSURANCE.** Landlord and its agents are not responsible for theft of personal property of Tenant, Tenant's guests or invitees; or for damage, loss, or destruction of personal property of Tenant, Tenant's guests or invitees, from any cause, including acts or omissions of third parties, unless caused by Landlord's failure to perform or negligent performance of a duty imposed by law. TENANT IS SPECIFICALLY ENCOURAGED TO INSURE ITS PERSONAL PROPERTY.

16. **ALTERATIONS.** Alterations to the Premises without Landlord's prior written consent are prohibited. Landlord is not liable to reimburse Tenant for any alteration, unless agreed in writing. Alterations are the property of Landlord. Upon the expiration or earlier termination of this Lease, however, Landlord may designate, in writing, alterations it wishes to have removed, and Tenant at its expense, shall remove them promptly and repair any damage caused thereby.

{80000\302\DT20927\DOC;1}

17.   **WAIVER OF SUBROGATION.** Tenant hereby relieves and discharges Landlord and the management company from all liability covered by any insurance carried by Tenant.

18.   **RETURN OF PREMISES.** Tenant shall return the Premises at the expiration of the term (or earlier termination) in as good a condition as when received, reasonable wear and tear accepted. Early surrender of the Premises, including surrender accepted in writing, shall not extinguish any of Tenant's obligations to perform under this lease, including payment of all rent reserved.

19.   **AMENDMENT.** Except as provided in paragraph 35, this Lease may be amended in writing only, signed by all parties.

20.   **CAPTIONS.** Section captions are solely to assist with identification. They are of no legal significance.

21.   **WAIVER.** Failure by Landlord to enforce a provision of this lease on one or more occasions, is not a continuing waiver of Landlord's right to enforce the provision.

22.   **SEVERABILITY.** A court ruling that a clause of this Lease is invalid, or the parties' written agreement that they no longer shall observe one or more Lease provisions, shall not invalidate any other clauses of this Lease.

23.   **PETS.** Dogs, cats and other small household pets may be kept at the Premises upon approval of the Landlord. All rules and regulations must be followed pertaining to the breed, size/weight of your pet. All dogs must be walked in the designated doggy area, all feces must be cleaned up by the pet owner and discarded in the pet feces disposal receptacles provided by the Landlord. All cats must be indoor pets and litter trained. Documentation from a licensed veterinarian, providing proof of your pet's vaccination(s), must be presented to the Management the day of lease signing. A photo of the pet will be taken by management and kept in the residents file. **THERE ARE NO VISITING PETS ALLOWED ON THE PROPERTY.**

24.   **USE AND QUIET ENJOYMENT.** Tenant shall comply with all applicable laws and ordinances; use the Premises for residential purposes only; and refrain from all conduct that unreasonably disturbs each other, other tenants or neighbors of the building. No business of any sort shall be located in or conducted from the Premises. Tenant shall be entitled to the quiet enjoyment of the Premises throughout this lease so long as Tenant complies with this Lease.

25.   **JOINT AND SEVERAL LIABILITY.** When there is more than one Tenant on the Lease, each tenant is jointly and severally liable for its full performance.

26.   **RULES AND REGULATIONS.** Tenant shall faithfully and fully observe any and all rules and regulations enacted by Landlord for the use and enjoyment of the Premises, the apartment community, the apartment areas and facilities. A copy of Landlord's current rules and regulations has been provided to Tenant.

27.   **UNTENANTABILITY.** If the Premises become wholly untenantable because of fire or other casualty, Landlord may cancel this Lease by notifying Tenant in writing, and Tenant shall surrender the Premises to Landlord. If for the same reasons the Premises become partially untenantable, or wholly untenantable without Landlord canceling the lease, Landlord shall repair the Premises with reasonable speed. From the date of the casualty, until repairs are substantially completed, Rent shall abate in the same percentage that the Premises are untenantable, unless the untenantability is caused by negligence or intentional misconduct of Tenant, Tenant's guests or invitees, in which case rent shall not abate. Landlord is not liable for failure to repair until Tenant has notified Landlord of the need for repair and a reasonable time to make the repair has passed thereafter. If more than half of the Premises are untenantable, the Premises are "wholly untenantable".

28.   **ASSIGNMENT, SUBLETTING, AND OCCUPANCY.** Tenant shall not assign this Lease or sublet the Premises, or any part thereof, without prior written permission of Landlord. Only those listed herein as Tenant may occupy the Premises. Landlord may evaluate proposed assignees and subtenants as it would evaluate prospective tenants, including whether they are acceptable to remaining prime Tenant.

4

29.     ABANDONMENT. If during this Lease, Landlord believes in good faith that Tenant has abandoned the Premises and current rent is unpaid, Landlord may re-enter the Premises and remove the remaining possessions of Tenant without liability therefore. Abandonment is conclusively presumed if rent is unpaid for fifteen days following the due date and (1) a substantial portion of Tenant's possessions have been removed or two acquaintances of Tenant or other reliable sources indicate to Landlord that Tenant has left without intending to re-occupy the Premises. If Tenant abandons or surrenders the Premises at anytime and leaves personal property there, Landlord may dispose of it however Landlord chooses, and Tenant shall reimburse Landlord for all costs incurred in that regard.

30.     HOLDING OVER. Tenant shall vacate the Premises on or before the expiration of the Lease. If Tenant retains possession thereafter without Landlord's written permission, Landlord has thirty days from the last day of the lease to sue Tenant for possession under section 5714(1)(C)(2) of the Michigan Summary Proceedings Act (Holding Over After Lease Expires). If suit is not begun within that time, the tenancy shall continue on a month to month basis from the date the lease expires, and all other covenants of the lease shall remain in full force and effect. Rent, however, shall increase by twenty percent, beginning on the first day after lease expiration, regardless of whether suit is brought. Acceptance of money by Landlord from Tenant during the thirty days following expiration of the lease does not waive Landlord's right to seek possession as described in this section, and Tenant shall compensate Landlord for all damages caused by its unauthorized holdover.

31.     LIMITED CANCELLATION RIGHTS. A Tenant who has occupied the Premises for more than thirteen months may terminate this Lease upon sixty days written notice to Landlord if: (i) Tenant has become eligible during the term to take possession of a subsidized rental unit in senior citizen housing and provides Landlord with written proof thereof; or (ii) Tenant has become incapable during the term of living independently, as certified by a physician in a notarized statement. Election to cancel under this paragraph is limited to the Tenant to whom the foregoing applies, and the Lease continues in full force and effect for remaining Tenants.

32.     ENTIRE AGREEMENT. This Lease is the parties' entire agreement, and they enter it voluntarily. There are no other agreements that are part of this Lease unless specifically enumerated herein. Tenant's Application to Lease is incorporated herein, and Tenant's covenant that the information supplied in that application was and continues to be accurate. During this lease and thereafter, Landlord or its agents (including a collection agency) may obtain Tenant's credit report, which Landlord or its agent may use in attempting to collect unpaid rent, late fees, or other charges from Tenant.

33.     DISCLOSURES. This Lease includes the following disclosures.

### MICHIGAN TRUTH IN RENTING ACT NOTICE

NOTICE: MICHIGAN LAW ESTABLISHES RIGHTS AND OBLIGATIONS FOR PARTIES TO RENTAL AGREEMENTS. THIS AGREEMENT IS REQUIRED TO COMPLY WITH THE TRUTH IN RENTING ACT. IF YOU HAVE A QUESTION ABOUT THE INTERPRETATION OR LEGALITY OF A PROVISION OF THIS AGREEMENT, YOU MAY WANT TO SEEK ASSISTANCE FROM A LAWYER OR OTHER QUALIFIED PERSON.

### MICHIGAN SECURITY DEPOSIT ACT NOTICE

TO TENANT: YOU MUST NOTIFY YOUR LANDLORD IN WRITING WITHIN FOUR (4) DAYS AFTER YOU MOVE OF A FORWARDING ADDRESS WHERE YOU CAN BE REACHED AND WHERE YOU WILL RECEIVE MAIL, OTHERWISE YOUR LANDLORD SHALL BE RELIEVED OF SENDING YOU AN ITEMIZED LIST OF DAMAGES AND THE PENALTIES ADHERENT TO THAT FAILURE.

34.     RENT SPECIALS: None

{80000/3023DT109877.DOC;1}

35.     **ATTORNEYS' FEES.** If Landlord institutes any legal action to collect any sums due hereunder or enforce any of the provisions hereof, Landlord shall be entitled to recover from Tenant, all costs incurred in connection with such action, including attorneys' fees.

36.     **ALTERATION OF RENTAL AGREEMENT BY LANDLORD:** Landlord may not alter this Lease except by giving Tenant thirty Days written notice for: (1) changes required by federal, state or local law, rule or regulation; (2) changes in rules relating to the Premises which are required to protect the health, safety, or peaceful enjoyment of tenants and guests; and (3) changes in the amount of rental payments to cover additional costs in operating the Premises incurred by the Landlord due to increases in ad valorem property, charges for electricity, natural gas, water, or sanitary sewer services consumed at the property, or increases in premiums for liability or fire insurance.

Date: 2/26, 2015

**LANDLORD:**

CROSSINGS AT BUENA VISTA
 DIVIDEND HOUSING ASSOCIATION
 LIMITED PARTNERSHIP, a Michigan
 Limited partnership.

By: Premier Real Estate Management, LLC,
 A Wisconsin Limited liability Company

Its: Management Company

By: _C Duffendier_

Its: President

Date:_____, 2015

**TENANT:**

_Ebony Hendrix_
Ebony Hendrix (Resident)

Lessee acknowledges that he/she has read this document and that he/she will receive a copy upon full execution.

**GUARANTORS OF LESSEE:**
In consideration of Lessor's agreement to this lease, the undersigned guarantee(s) the payment of all amounts due under the lease and the covenants by Lessee.

Guarantor                                    Date

{80000302NDT209877.DOC;1}

### RESIDENTIAL LEASE
### CROSSINGS AT BUENA VISTA Phase I
### SAGINAW, MICHIGAN

**THIS RESIDENTIAL LEASE ("Lease")** is made effective as of May 9, 2014 between THE CROSSINGS AT BUENA VISTA, LIMITED DIVIDEND HOUSING ASSOCIATION LIMITED PARTNERSHIP, a Michigan limited partnership (the "Landlord"), whose address for purposes of this Lease is 19105 W. Capital Drive, Suite 200, Brookfield, Wisconsin, and Kelly Spiller individually and collectively (the "Tenant"). Landlord, in consideration of the rents to be paid and the covenants to be performed by Tenant, does hereby lease to tenant, and Tenant herby leases from Landlord, apartment unit #1 in the building located at 3684 Hess Ave ., THE CROSSINGS AT BUENA VISTA, Saginaw, Michigan. ("the Premises").

### COVENANTS

1. **DESCRIPTION AND CONDITION.** Landlord rents to Tenant the Premises. The Premises are not furnished. Tenant acknowledges that it has received a move-in inventory checklist. The Premises are conclusively presumed to be in good condition at move-in, unless Tenant specifies objections on that list and returns a completed copy of it to Landlord within seven (7) days after receiving the list. The move-in inventory checklist is not a request for repairs.

2. **TERM AND POSSESSION.** This Lease begins on June 1, 2014 and runs through April 30, 2015. Possession will not be provided until the first month's rent and Security Deposit are paid. If the Premises are not ready on the date this lease commences, the sole damage for which Landlord shall be liable to Tenant is the full abatement of Tenant's prorated rent from the date this lease commences to the date the Premises are ready for occupancy, which date is at Landlord's exclusive determination. If Tenant does not take possession on the day it is to be provided, and Tenant has not given Landlord written notice that it will take possession on a later day, Landlord may presume conclusively that Tenant has abandoned the Premises and Landlord may re-rent the Premises. There shall be no more than (3) occupants living in the Premises during the tenancy. Tenant will be charged a penalty of $100.00 per month for each occupant exceeding that number. Only the following named resident may occupy the apartment: <u>Kelly Spiller, Kameron Spiller(m), Kennedy Coleman(m)</u>.

3. **RENT.** Tenant shall pay Landlord total rent for the term of 11 months. Rent shall be paid in equal monthly installments of $599.00 due on the first day of each month, beginning with the second month (the first month will be collected move-in). If the rent is not paid by the first day of the month then an additional $50.00 paperwork processing fee shall be added to the rent owing for that month. Landlord may require installments to be paid with certified funds or money orders and in a single payment. Rent is considered paid only when actually received by Landlord.

4. **PLACE OF PAYMENT AND NOTICES.** Notices to Tenant shall be delivered or sent to the Premises. Payment of rent or other charge due from Tenant and notices to Landlord shall be delivered or sent to Premier Real Estate Management, LLC, 19105 W. Capital Drive, Suite 200, Brookfield, Wisconsin 53045. Notices required by this lease or by law shall be in writing. Notices that are mailed (including security deposit notices) are deemed received by the other party on the next regular day for delivery of mail after being stamped with sufficient postage and deposited in a United States mailbox. A 60 Day Notice of intent to vacate must be given in writing to the above address on or before the first of the month, including a forwarding address.

5. **SECURITY DEPOSIT.** Tenant shall pay a $250.00 security deposit before receiving possession. The deposit, or any portion of it that is returned, shall be returned in a check, payable to all Tenants, or may be returned entirely to one Tenant if all other Tenants have so authorized Landlord in writing. Security Deposit Act communications shall be addressed to Landlord at the address in paragraph 4. Tenant may not elect to use the deposit for rent.

6. **DEFAULT AND REMEDIES.** Tenant's noncompliance with any covenant of this Lease is a default. If Tenant defaults, Landlord may pursue all remedies legally permitted, including termination of this tenancy. On seven days written notice, Landlord also may terminate this tenancy if Tenant, a member of Tenant's household, or other person under Tenant's control unlawfully manufactures, delivers, possesses with intent to deliver, or possesses a controlled substance on the Premises. Recovery of the Premises by the Landlord shall not relieve the Tenant of any obligation under this Lease, and upon default, Landlord shall be permitted to accelerate the rent due throughout the term of this Lease and demand immediate payment thereof. Tenant shall reimburse Landlord for all legal fees, costs, and expenses legally recoverable and for all damages caused by its default, including costs of re-renting the Premises and all rent for the remainder of the term and succeeding terms that Landlord does not collect through mitigation. If other Premises owned or managed by Landlord are available for lease, it shall not be unreasonable for Landlord to lease them before Tenant's Premises. From the date of execution, time is of the essence of this lease. If Landlord terminates this tenancy, it may cancel, by written notice, any renewal, lease extension, or lease for a future term that Landlord and Tenant have executed.

7.    **UTILITIES.** Tenant shall put utilities for the Premises into its name, maintain uninterrupted service throughout the Term, and timely pay all utility bills, including heat and electricity. Range and refrigerator supplied by landlord. Tenant shall pay any penalties imposed by utility providers because of late payment of original bills that are Tenant's responsibility to pay. Tenant shall maintain a reasonable amount of heat in cold weather to prevent damage to the Premises (i.e., prevent frozen water pipes). Tenant shall be responsible for any and all damages to the Premises that arise from its failure to comply with this requirement.

8.    **LATE FEES AND DISHONORED CHECKS.** In addition to late fees described in Section 3, Tenant shall pay Landlord $25.00 for any check to Landlord that is dishonored.

9.    **CHRONIC LATE PAYMENT OF RENT.** Rent is due on the first day of each month, and not withstanding Section 8, Landlord may terminate this Lease because Tenant is chronically late in rent. Chronic late payment is defined as paying rent after the due date on three or more occasions during this Lease.

10.    **APPLICATION OF MONEY FROM TENANT.** Money received by Landlord from Tenant or on its behalf shall be applied to Tenant's account as follows: first to satisfy unpaid late fees, dishonored check fees, and to other fees owed by Tenant; second to maintenance and repair costs chargeable to Tenant; third to legal fees and court costs legally chargeable to Tenant, including costs incurred prior to curing a default; fourth to outstanding utility bills that are the responsibility of Tenant; fifth to deposits or portions thereof due from Tenants and sixth to rent. Restrictive endorsements on a check or statements in any communication, including those accompanying a payment, shall not constitute an accord and satisfaction or amend this provision.

11.    **KEYS.** Landlord may retain a key to the Premises throughout the Lease. Tenant shall not change the locks without Landlord's prior written consent, and Tenant shall immediately provide Landlord with a key to any new lock if the locks are changed. Landlord may charge Tenant a reasonable amount for replacing lost keys and for assisting Tenant in gaining entry to the Premises.

12.    **ENTRY BY LANDLORD.** Landlord or its agents may enter the Premises in an emergency or to perform repairs, maintenance, code inspections, appraisals, insurance inspections, other purposes reasonably related to the operation of the building, and to show the Premises for lease. Except during an actual or apparent emergency, all entries shall be made during reasonable hours; and Landlord shall make reasonable efforts to inform Tenant of its intention to enter and shall attempt to establish a mutually acceptable time.

13.    **MAINTENANCE.** Tenant shall use and maintain the Premises in accordance with applicable police, sanitary, and all other regulations imposed by governmental authorities. Tenant also shall maintain the Premises in a neat and orderly manner. Tenant will observe all reasonable regulations and requirements of underwriters concerning use and condition of the Premises tending to reduce fire hazard and insurance rates. Tenant shall pay for the repair of all damage to the Premises and structure of which it is a part, including fire and flood damage, caused by Tenant, its guests or invitees; they shall reimburse Landlord for all permit, inspection, and certification costs it incurs because of their noncompliance with this lease or applicable laws; and they shall reimburse Landlord for all damages resulting from not reporting the need for repair or maintenance in a reasonably timely manner. Nothing in this clause shall waive or lessen Landlord's obligation to maintain and repair the Premises under Michigan law, but Landlord is not liable for any loss that accrues to Tenant because of Landlord's actions in reasonably fulfilling its obligations hereunder.

14.    **INDEMNIFICATION.** Tenant agrees for Tenant and Tenant's heirs, and personal representatives, to indemnify, hold harmless and defend Landlord and Landlord's management company from all damages, loss, including lost rents, or liability that results from Tenant's negligent or improper use of the Premises and common areas in the apartment complex and from Tenant's  or any guest of Tenant's intentional misuse of them.

15.    **INSURANCE.** Landlord and its agents are not responsible for theft of personal property of Tenant, Tenant's guests or invitees; or for damage, loss, or destruction of personal property of Tenant, Tenant's guests or invitees, from any cause, including acts or omissions of third parties, unless caused by Landlord's failure to perform or negligent performance of a duty imposed by law. TENANT IS SPECIFICALLY ENCOURAGED TO INSURE ITS PERSONAL PROPERTY.

16.    **ALTERATIONS.** Alterations to the Premises without Landlord's prior written consent are prohibited. Landlord is not liable to reimburse Tenant for any alteration, unless agreed in writing. Alterations are the property of Landlord. Upon the expiration or earlier termination of this Lease, however, Landlord may designate, in writing, alterations it wishes to have removed, and Tenant at its expense, shall remove them promptly and repair any damage caused thereby.

{80000/02DT269877.DOC;1}

**17.**     **WAIVER OF SUBROGATION.** Tenant hereby relieves and discharges Landlord and the management company from all liability covered by any insurance carried by Tenant.

**18.**     **RETURN OF PREMISES.** Tenant shall return the Premises at the expiration of the term (or earlier termination) in as good a condition as when received, reasonable wear and tear accepted. Early surrender of the Premises, including surrender accepted in writing, shall not extinguish any of Tenant's obligations to perform under this lease, including payment of all rent reserved.

**19.**     **AMENDMENT.** Except as provided in paragraph 35, this Lease may be amended in writing only, signed by all parties.

**20.**     **CAPTIONS.** Section captions are solely to assist with identification. They are of no legal significance.

**21.**     **WAIVER.** Failure by Landlord to enforce a provision of this lease on one or more occasions, is not a continuing waiver of Landlord's right to enforce the provision.

**22.**     **SEVERABILITY.** A court ruling that a clause of this Lease is invalid, or the parties' written agreement that they no longer shall observe one or more Lease provisions, shall not invalidate any other clauses of this Lease.

**23.**     **PETS.** Dogs, cats and other small household pets may be kept at the Premises upon approval of the Landlord. All rules and regulations must be followed pertaining to the breed, size/weight of your pet. All dogs must be walked in the designated doggy area, all feces must be cleaned up by the pet owner and discarded in the pet feces disposal receptacles provided by the Landlord. All cats must be indoor pets and liter trained. Documentation from a licensed veterinarian, providing proof of your pet's vaccination(s), must be presented to the Management the day of lease signing. A photo of the pet will be taken by management and kept in the residents file. **THERE ARE NO VISITING PETS ALLOWED ON THE PROPERTY.**

**24.**     **USE AND QUIET ENJOYMENT.** Tenant shall comply with all applicable laws and ordinances; use the Premises for residential purposes only; and refrain from all conduct that unreasonably disturbs each other, other tenants or neighbors of the building. No business of any sort shall be located in or conducted from the Premises. Tenant shall be entitled to the quiet enjoyment of the Premises throughout this lease so long as Tenant complies with this Lease.

**25.**     **JOINT AND SEVERAL LIABILITY.** When there is more than one Tenant on the Lease, each tenant is jointly and severally liable for its full performance.

**26.**     **RULES AND REGULATIONS.** Tenant shall faithfully and fully observe any and all rules and regulations enacted by Landlord for the use and enjoyment of the Premises, the apartment community, the apartment areas and facilities. A copy of Landlord's current rules and regulations has been provided to Tenant.

**27.**     **UNTENANTABILITY.** If the Premises become wholly untenantable because of fire or other casualty, Landlord may cancel this Lease by notifying Tenant in writing, and Tenant shall surrender the Premises to Landlord. If for the same reasons the Premises become partially untenantable, or wholly untenantable without Landlord canceling the lease, Landlord shall repair the Premises with reasonable speed. From the date of the casualty, until repairs are substantially completed, Rent shall abate in the same percentage that the Premises are untenantable, unless the untenantability is caused by negligence or intentional misconduct of Tenant, Tenant's guests or invitees, in which case rent shall not abate. Landlord is not liable for failure to repair until Tenant has notified Landlord of the need for repair and a reasonable time to make the repair has passed thereafter. If more than half of the Premises are untenantable, the Premises are "wholly untenantable".

**28.**     **ASSIGNMENT, SUBLETTING, AND OCCUPANCY.** Tenant shall not assign this Lease or sublet the Premises; or any part thereof, without prior written permission of Landlord. Only those listed herein as Tenant may occupy the Premises. Landlord may evaluate proposed assignees and subtenants as it would evaluate prospective tenants, including whether they are acceptable to remaining prime Tenant.

[8X00030(ADT209877.DOC;1]

4

29.     **ABANDONMENT.** If during this Lease, Landlord believes in good faith that Tenant has abandoned the Premises and current rent is unpaid, Landlord may re-enter the Premises and remove the remaining possessions of Tenant without liability therefore. Abandonment is conclusively presumed if rent is unpaid for fifteen days following the due date and (1) a substantial portion of Tenant's possessions have been removed or two acquaintances of Tenant or other reliable sources indicate to Landlord that Tenant has left without intending to re-occupy the Premises. If Tenant abandons or surrenders the Premises at anytime and leaves personal property there, Landlord may dispose of it however Landlord chooses, and Tenant shall reimburse Landlord for all costs incurred in that regard.

30.     **HOLDING OVER.** Tenant shall vacate the Premises on or before the expiration of the Lease. If Tenant retains possession thereafter without Landlord's written permission, Landlord has thirty days from the last day of the lease to sue Tenant for possession under section 5714(1)(C)(2) of the Michigan Summary Proceedings Act (Holding Over After Lease Expires). If suit is not begun within that time, the tenancy shall continue on a month to month basis from the date the lease expires, and all other covenants of the lease shall remain in full force and effect. Rent, however, shall increase by twenty percent, beginning on the first day after lease expiration, regardless of whether suit is brought. Acceptance of money by Landlord from Tenant during the thirty days following expiration of the lease does not waive Landlord's right to seek possession as described in this section, and Tenant shall compensate Landlord for all damages caused by its unauthorized holdover.

31.     **LIMITED CANCELLATION RIGHTS.** A Tenant who has occupied the Premises for more than thirteen months may terminate this Lease upon sixty days written notice to Landlord if: (i) Tenant has become eligible during the term to take possession of a subsidized rental unit in senior citizen housing and provides Landlord with written proof thereof; or (ii) Tenant has become incapable during the term of living independently, as certified by a physician in a notarized statement. Election to cancel under this paragraph is limited to the Tenant to whom the foregoing applies, and the Lease continues in full force and effect for remaining Tenants.

32.     **ENTIRE AGREEMENT.** This Lease is the parties' entire agreement, and they enter it voluntarily. There are no other agreements that are part of this Lease unless specifically enumerated herein. Tenant's Application to Lease is incorporated herein, and Tenant's covenant that the information supplied in that application was and continues to be accurate. During this lease and thereafter, Landlord or its agents (including a collection agency) may obtain Tenant's credit report, which Landlord or its agent may use in attempting to collect unpaid rent, late fees, or other charges from Tenant.

33.     **DISCLOSURES.** This Lease includes the following disclosures.

MICHIGAN TRUTH IN RENTING ACT NOTICE

NOTICE: MICHIGAN LAW ESTABLISHES RIGHTS AND OBLIGATIONS FOR PARTIES TO RENTAL AGREEMENTS. THIS AGREEMENT IS REQUIRED TO COMPLY WITH THE TRUTH IN RENTING ACT. IF YOU HAVE A QUESTION ABOUT THE INTERPRETATION OR LEGALITY OF A PROVISION OF THIS AGREEMENT, YOU MAY WANT TO SEEK ASSISTANCE FROM A LAWYER OR OTHER QUALIFIED PERSON.

MICHIGAN SECURITY DEPOSIT ACT NOTICE

TO TENANT: YOU MUST NOTIFY YOUR LANDLORD IN WRITING WITHIN FOUR (4) DAYS AFTER YOU MOVE OF A FORWARDING ADDRESS WHERE YOU CAN BE REACHED AND WHERE YOU WILL RECEIVE MAIL, OTHERWISE YOUR LANDLORD SHALL BE RELIEVED OF SENDING YOU AN ITEMIZED LIST OF DAMAGES AND THE PENALTIES ADHERENT TO THAT FAILURE.

34.     **RENT SPECIALS: NONE**

5

35.   **ATTORNEYS' FEES.**  If Landlord institutes any legal action to collect any sums due hereunder or enforce any of the provisions hereof, Landlord shall be entitled to recover from Tenant, all costs incurred in connection with such action, including attorneys' fees.

36.   **ALTERATION OF RENTAL AGREEMENT BY LANDLORD:** Landlord may not alter this Lease except by giving Tenant thirty Days written notice for: (1) changes required by federal, state or local law, rule or regulation; (2) changes in rules relating to the Premises which are required to protect the health, safety, or peaceful enjoyment of tenants and guests; and (3) changes in the amount of rental payments to cover additional costs in operating the Premises incurred by the Landlord due to increases in ad valorem property, charges for electricity, natural gas, water, or sanitary sewer services consumed at the property, or increases in premiums for liability or fire insurance.

Date: 5/29, 2014

**LANDLORD:**

CROSSINGS AT BUENA VISTA
  DIVIDEND HOUSING ASSOCIATION
  LIMITED PARTNERSHIP, a Michigan
  Limited partnership.

By: Premier Real Estate Management, LLC,
A Wisconsin Limited liability Company

Its: Management Company

By: _____

Its: _____

Date: 5/9, 2014

**TENANT:**

_____
Kelly Spiller (Resident)

Lessee acknowledges that he/she has read this document and that he/she will receive a copy upon full execution.

**GUARANTORS OF LESSEE:**
In consideration of Lessor's agreement to this lease, the undersigned guarantee(s) the payment of all amounts due under the lease and the covenants by Lessee.

_____          _____
Guarantor                         Date

{80000\007\DT209877.DOC;1}

**RESIDENTIAL LEASE RENEWAL**
**CROSSINGS AT BUENA VISTA Phase I**
**SAGINAW, MICHIGAN**

THIS RESIDENTIAL LEASE ("Lease") is made effective as of November 1, 2014 between THE CROSSINGS AT BUENA VISTA, LIMITED DIVIDEND HOUSING ASSOCIATION LIMITED PARTNERSHIP, a Michigan limited partnership (the "Landlord"), whose address for purposes of this Lease is 19105 W. Capital Drive, Suite 200, Brookfield, Wisconsin, and Felicia McDaniel, Eric Peterson & Devin Peterson individually and collectively (the "Tenant"). Landlord, in consideration of the rents to be paid and the covenants to be performed by Tenant, does hereby lease to tenant, and Tenant herby leases from Landlord, apartment unit #2 in the building located at 3684 Hess Ave., THE CROSSINGS AT BUENA VISTA, Saginaw, Michigan. ("the Premises").

**COVENANTS**

1.    **DESCRIPTION AND CONDITION.** Landlord rents to Tenant the Premises. The Premises are not furnished. Tenant acknowledges that it has received a move-in inventory checklist. The Premises are conclusively presumed to be in good condition at move-in, unless Tenant specifies objections on that list and returns a completed copy of it to Landlord within seven (7) days after receiving the list. The move-in inventory checklist is not a request for repairs.

2.    **TERM AND POSSESSION.** This Lease begins on November 1, 2014 and runs through October 31, 2015. Possession will not be provided until the first month's rent and Security Deposit are paid. If the Premises are not ready on the date this lease commences, the sole damage for which Landlord shall be liable to Tenant is the full abatement of Tenant's prorated rent from the date this lease commences to the date the Premises are ready for occupancy, which date is at Landlord's exclusive determination. If Tenant does not take possession on the day it is to be provided, and Tenant has not given Landlord written notice that it will take possession on a later day, Landlord may presume conclusively that Tenant has abandoned the Premises and Landlord may re-rent the Premises. There shall be no more than (3) occupants living in the Premises during the tenancy. Tenant will be charged a penalty of $100.00 per month for each occupant exceeding that number. Only the following named resident may occupy the apartment: Felicia McDaniel, Eric Peterson, Devin Peterson.

3.    **RENT.** Tenant shall pay Landlord total rent for the term of 12 months. Rent shall be paid in equal monthly installments of $569.00 due on the first day of each month, beginning with the second month (the first month will be collected before move-in). If the rent is not paid by the first day of the month, then an additional $50.00 paperwork processing fee shall be added to the rent owing for that month. Landlord may require installments to be paid with certified funds or money orders and in a single payment. Rent is considered paid only when actually received by Landlord.

4.    **PLACE OF PAYMENT AND NOTICES.** Notices to Tenant shall be delivered or sent to the Premises. Payment of rent or other charge due from Tenant and notices to Landlord shall be delivered or sent to Premier Real Estate Management, LLC, 19105 W. Capital Drive, Suite 200, Brookfield, Wisconsin 53045. Notices required by this lease or by law shall be in writing. Notices that are mailed (including security deposit notices) are deemed received by the other party on the next regular day for delivery of mail after being stamped with sufficient postage and deposited in a United States mailbox. A 60 Day Notice of Intent to vacate must be given in writing to the above address on or before the first of the month, including a forwarding address.

5.    **SECURITY DEPOSIT.** Tenant shall pay a $250.00 security deposit before receiving possession. The deposit, or any portion of it that is returned, shall be returned in a check, payable to all Tenants, or may be returned entirely to one Tenant if all other Tenants have so authorized Landlord in writing. Security Deposit Act communications shall be addressed to Landlord at the address in paragraph 4. Tenant may not elect to use the deposit for rent.

6.    **DEFAULT AND REMEDIES.** Tenant's noncompliance with any covenant of this Lease is a default. If Tenant defaults, Landlord may pursue all remedies legally permitted, including termination of this tenancy. On seven days written notice, Landlord also may terminate this tenancy if Tenant, a member of Tenant's household, or other person under Tenant's control unlawfully manufactures, delivers, possesses with intent to deliver, or possesses a controlled substance on the Premises. Recovery of the Premises by the Landlord shall not relieve the Tenant of any obligation under this Lease, and upon default, Landlord shall be permitted to accelerate the rent due throughout the term of this Lease and demand immediate payment thereof. Tenant shall reimburse Landlord for all legal fees, costs, and expenses legally recoverable and for all damages caused by its default, including costs of re-renting the Premises and all rent for the remainder of the term and succeeding terms that Landlord does not collect through mitigation. If other Premises owned or managed by Landlord are available for lease, it shall not be unreasonable for Landlord to lease them before Tenant's Premises. From the date of execution, time is of the essence of this lease. If Landlord terminates this tenancy, it may cancel, by written notice, any renewal, lease extension, or lease for a future term that Landlord and Tenant have executed.

{800009307AUT209877.DOC;1}

2

7.     UTILITIES. Tenant shall put utilities for the Premises into its name, maintain uninterrupted service throughout the Term, and timely pay all utility bills, including heat and electricity. Range and refrigerator supplied by landlord. Tenant shall pay any penalties imposed by utility providers because of late payment of original bills that are Tenant's responsibility to pay. Tenant shall maintain a reasonable amount of heat in cold weather to prevent damage to the Premises (i.e., prevent frozen water pipes). Tenant shall be responsible for any and all damages to the Premises that arise from its failure to comply with this requirement.

8.     LATE FEES AND DISHONORED CHECKS. In addition to late fees described in Section 3, Tenant shall pay Landlord $25.00 for any check to Landlord that is dishonored.

9.     CHRONIC LATE PAYMENT OF RENT. Rent is due on the first day of each month, and not withstanding Section 8, Landlord may terminate this Lease because Tenant is chronically late in rent. Chronic late payment is defined as paying rent after the due date on three or more occasions during this Lease.

10.     APPLICATION OF MONEY FROM TENANT. Money received by Landlord from Tenant or on its behalf shall be applied to Tenant's account as follows: first to satisfy unpaid late fees, dishonored check fees, and to other fees owed by Tenant; second to maintenance and repair costs chargeable to Tenant; third to legal fees and court costs legally chargeable to Tenant, including costs incurred prior to curing a default; fourth to outstanding utility bills that are the responsibility of Tenant; fifth to deposits or portions thereof due from Tenants and sixth to rent. Restrictive endorsements on a check or statements in any communication, including those accompanying a payment, shall not constitute an accord and satisfaction or amend this provision.

11.     KEYS. Landlord may retain a key to the Premises throughout the Lease. Tenant shall not change the locks without Landlord's prior written consent, and Tenant shall immediately provide Landlord with a key to any new lock if the locks are changed. Landlord may charge Tenant a reasonable amount for replacing lost keys and for assisting Tenant in gaining entry to the Premises.

12.     ENTRY BY LANDLORD. Landlord or its agents may enter the Premises in an emergency or to perform repairs, maintenance, code inspections, appraisals, insurance inspections, other purposes reasonably related to the operation of the building, and to show the Premises for lease. Except during an actual or apparent emergency, all entries shall be made during reasonable hours; and Landlord shall make reasonable efforts to inform Tenant of its intention to enter and shall attempt to establish a mutually acceptable time.

13.     MAINTENANCE. Tenant shall use and maintain the Premises in accordance with applicable police, sanitary, and all other regulations imposed by governmental authorities. Tenant also shall maintain the Premises in a neat and orderly manner. Tenant will observe all reasonable regulations and requirements of underwriters concerning use and condition of the Premises tending to reduce fire hazard and insurance rates. Tenant shall pay for the repair of all damage to the Premises and structure of which it is a part, including fire and flood damage, caused by Tenant, its guests or invitees; they shall reimburse Landlord for all permit, inspection, and certification costs it incurs because of their noncompliance with this lease or applicable laws; and they shall reimburse Landlord for all damages resulting from not reporting the need for repair or maintenance in a reasonably timely manner. Nothing in this clause shall waive or lessen Landlord's obligation to maintain and repair the Premises under Michigan law, but Landlord is not liable for any loss that accrues to Tenant because of Landlord's actions in reasonably fulfilling its obligations hereunder.

14.     INDEMNIFICATION. Tenant agrees for Tenant and Tenant's heirs, and personal representatives, to indemnify, hold harmless and defend Landlord and Landlord's management company from all damages, loss, including lost rents, or liability that results from Tenant's negligent or improper use of the Premises and common areas in the apartment complex and from Tenant's  or any guest of Tenant's intentional misuse of them.

15.     INSURANCE. Landlord and its agents are not responsible for theft of personal property of Tenant, Tenant's guests or invitees; or for damage, loss, or destruction of personal property of Tenant, Tenant's guests or invitees, from any cause, including acts or omissions of third parties, unless caused by Landlord's failure to  perform or negligent performance of a duty imposed by law. TENANT IS SPECIFICALLY ENCOURAGED TO INSURE ITS PERSONAL PROPERTY.

16.     ALTERATIONS. Alterations to the Premises without Landlord's prior written consent are prohibited. Landlord is not liable to reimburse Tenant for any alteration, unless agreed in writing. Alterations are the property of Landlord. Upon the expiration or earlier termination of this Lease, however, Landlord may designate, in writing, alterations it wishes to have removed, and Tenant at its expense, shall remove them promptly and repair any damage caused thereby.

{800003302DY209877.DOC;1}

3

17.    **WAIVER OF SUBROGATION.** Tenant hereby relieves and discharges Landlord and the management company from all liability covered by any insurance carried by Tenant.

18.    **RETURN OF PREMISES.** Tenant shall return the Premises at the expiration of the term (or earlier termination) in as good a condition as when received, reasonable wear and tear accepted. Early surrender of the Premises, including surrender accepted in writing, shall not extinguish any of Tenant's obligations to perform under this lease, including payment of all rent reserved.

19.    **AMENDMENT.** Except as provided in paragraph 35, this Lease may be amended in writing only, signed by all parties.'

20.    **CAPTIONS.** Section captions are solely to assist with identification. They are of no legal significance.

21.    **WAIVER.** Failure by *Landlord* to enforce a provision of this lease on one or more occasions, is not a continuing waiver of Landlord's right to enforce the provision.

22.    **SEVERABILITY.** A court ruling that a clause of this Lease is invalid, or the parties' written agreement that they no longer shall observe one or more Lease provisions, shall not invalidate any other clauses of this Lease.

23.    **PETS.** Dogs, cats and other small household pets may be kept at the Premises upon approval of the Landlord. All rules and regulations must be followed pertaining to the breed, size/weight of your pet. All dogs must be walked in the designated doggy area, all feces must be cleaned up by the pet owner and discarded in the pet feces disposal receptacles provided by the Landlord. All cats must be indoor pets and litter trained. Documentation from a licensed veterinarian, providing proof of your pet's vaccination(s), must be presented to the Management the day of lease signing. A photo of the pet will be taken by management and kept in the residents file. **THERE ARE NO VISITING PETS ALLOWED ON THE PROPERTY.**

24.    **USE AND QUIET ENJOYMENT.** Tenant shall comply with all applicable laws and ordinances; use the Premises for residential purposes only; and refrain from all conduct that unreasonably disturbs each other, other tenants or neighbors of the building. No business of any sort shall be located in or conducted from the Premises. Tenant shall be entitled to the quiet enjoyment of the Premises throughout this lease so long as Tenant complies with this Lease.

25.    **JOINT AND SEVERAL LIABILITY.** When there is more than one Tenant on the Lease, each tenant is jointly and severally liable for its full performance.

26.    **RULES AND REGULATIONS.** Tenant shall faithfully and fully observe any and all rules and regulations enacted by Landlord for the use and enjoyment of the Premises, the apartment community, the apartment areas and facilities. A copy of Landlord's current rules and regulations has been provided to Tenant.

27.    **UNTENANTABILITY.** If the Premises become wholly untenantable because of fire or other casualty, Landlord may cancel this Lease by notifying Tenant in writing, and Tenant shall surrender the Premises to Landlord. If for the same reasons the Premises become partially untenantable, or wholly untenantable without Landlord canceling the lease, Landlord shall repair the Premises with reasonable speed. From the date of the casualty, until repairs are substantially completed, Rent shall abate in the same percentage that the Premises are untenantable, unless the untenantability is caused by negligence or intentional misconduct of Tenant, Tenant's guests or invitees, in which case rent shall not abate. Landlord is not liable for failure to repair until Tenant has notified Landlord of the need for repair and a reasonable time to make the repair has passed thereafter. If more than half of the Premises are untenantable, the Premises are "wholly untenantable".

28.    **ASSIGNMENT, SUBLETTING, AND OCCUPANCY.** Tenant shall not assign this Lease or sublet the Premises, or any part thereof, without prior written permission of Landlord. Only those listed herein as Tenant may occupy the Premises. Landlord may evaluate proposed assignees and subtenants as it would evaluate prospective tenants, including whether they are acceptable to remaining prime Tenant.

{80000\302\DT209877.DOC;1}

4

29.     **ABANDONMENT.** If during this Lease, Landlord believes in good faith that Tenant has abandoned the Premises and current rent is unpaid, Landlord may re-enter the Premises and remove the remaining possessions of Tenant without liability therefore. Abandonment is conclusively presumed if rent is unpaid for fifteen days following the due date and (1) a substantial portion of Tenant's possessions have been removed or two acquaintances of Tenant or other reliable sources indicate to Landlord that Tenant has left without intending to re-occupy the Premises. If Tenant abandons or surrenders the Premises at anytime and leaves personal property there, Landlord may dispose of it however Landlord chooses, and Tenant shall reimburse Landlord for all costs incurred in that regard.

30.     **HOLDING OVER.** Tenant shall vacate the Premises on or before the expiration of the Lease. If Tenant retains possession thereafter without Landlord's written permission, Landlord has thirty days from the last day of the lease to sue Tenant for possession under section 5714(1)(C)(2) of the Michigan Summary Proceedings Act (Holding Over After Lease Expires). If suit is not begun within that time, the tenancy shall continue on a month to month basis from the date the lease expires, and all other covenants of the lease shall remain in full force and effect. Rent, however, shall increase by twenty percent, beginning on the first day after lease expiration, regardless of whether suit is brought. Acceptance of money by Landlord from Tenant during the thirty days following expiration of the lease does not waive Landlord's right to seek possession as described in this section, and Tenant shall compensate Landlord for all damages caused by its unauthorized holdover.

31.     **LIMITED CANCELLATION RIGHTS.** A Tenant who has occupied the Premises for more than thirteen months may terminate this Lease upon sixty days written notice to Landlord if: (i) Tenant has become eligible during the term to take possession of a subsidized rental unit in senior citizen housing and provides Landlord with written proof thereof; or (ii) Tenant has become incapable during the term of living independently, as certified by a physician in a notarized statement. Election to cancel under this paragraph is limited to the Tenant to whom the foregoing applies, and the Lease continues in full force and effect for remaining Tenants.

32.     **ENTIRE AGREEMENT.** This Lease is the parties' entire agreement, and they enter it voluntarily. There are no other agreements that are part of this Lease unless specifically enumerated herein. Tenant's Application to Lease is incorporated herein, and Tenant's covenant that the information supplied in that application was and continues to be accurate. During this lease and thereafter, Landlord or its agents (including a collection agency) may obtain Tenant's credit report, which Landlord or its agent may use in attempting to collect unpaid rent, late fees, or other charges from Tenant.

33.     **DISCLOSURES.** This Lease includes the following disclosures.

### MICHIGAN TRUTH IN RENTING ACT NOTICE

NOTICE: MICHIGAN LAW ESTABLISHES RIGHTS AND OBLIGATIONS FOR PARTIES TO RENTAL AGREEMENTS. THIS AGREEMENT IS REQUIRED TO COMPLY WITH THE TRUTH IN RENTING ACT. IF YOU HAVE A QUESTION ABOUT THE INTERPRETATION OR LEGALITY OF A PROVISION OF THIS AGREEMENT, YOU MAY WANT TO SEEK ASSISTANCE FROM A LAWYER OR OTHER QUALIFIED PERSON.

### MICHIGAN SECURITY DEPOSIT ACT NOTICE

TO TENANT: YOU MUST NOTIFY YOUR LANDLORD IN WRITING WITHIN FOUR (4) DAYS AFTER YOU MOVE OF A FORWARDING ADDRESS WHERE YOU CAN BE REACHED AND WHERE YOU WILL RECEIVE MAIL, OTHERWISE YOUR LANDLORD SHALL BE RELIEVED OF SENDING YOU AN ITEMIZED LIST OF DAMAGES AND THE PENALTIES ADHERENT TO THAT FAILURE.

34.     **RENT SPECIALS:** None

[80000930X0T209877.DOC;1]

5

**35.** **ATTORNEYS' FEES.** If Landlord institutes any legal action to collect any sums due hereunder or enforce any of the provisions hereof, Landlord shall be entitled to recover from Tenant, all costs incurred in connection with such action, including attorneys' fees.

**36.** **ALTERATION OF RENTAL AGREEMENT BY LANDLORD:** Landlord may not alter this Lease except by giving Tenant thirty Days written notice for: (1) changes required by federal, state or local law, rule or regulation; (2) changes in rules relating to the Premises which are required to protect the health, safety, or peaceful enjoyment of tenants and guests; and (3) changes in the amount of rental payments to cover additional costs in operating the Premises incurred by the Landlord due to increases in ad valorem property, charges for electricity, natural gas, water, or sanitary sewer services consumed at the property, or increases in premiums for liability or fire insurance.

Date: 12|29, 2014

**LANDLORD:**

CROSSINGS AT BUENA VISTA
 DIVIDEND HOUSING ASSOCIATION
 LIMITED PARTNERSHIP, a  Michigan
 Limited partnership.

By: Premier Real Estate Management, LLC,
 A Wisconsin Limited liability Company

Its: Management Company

By: _____

Its: _____

Date: 11|1, 2014

**TENANT:**

_____
Felicia McDonald (Resident)

_____
Eric Peterson (Resident)

_____
Devin Peterson (Resident)

Lessee acknowledges that he/she has read this document and that he/she will receive a copy upon full execution.

**GUARANTORS OF LESSEE:**
In consideration of Lessor's agreement to this lease, the undersigned guarantee(s) the payment of all amounts due under the lease and the covenants by Lessee.

_____          _____
Guarantor                                          Date

[80000\302\DT269872.DOC;1]

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN – NORTHERN DIVISION

EBONY HENDRIX, KELLY SPILLER,
AND FELICIA MCDANIEL,

                Case No. 1:15-cv-12364

                Plaintiffs,            Hon. Thomas L. Ludington

v.

CALVIN AKIN, PREMIER REAL ESTATE
MANAGEMENT, LLC, PREMIER
SAGINAW, I LLC AND, ORKIN, LLC,

                Defendants.

_____/

## CERTIFICATE OF SERVICE

    I hereby certify that I am employed by Jaffe Raitt Heuer & Weiss, PC, and that on November 6, 2015 I electronically filed the foregoing papers with the Clerk of the Court using the ECF system which will send notification of such filing to all counsel of record.

                /s/ Deborah Gutierrez_____
                dgutierrez@jaffelaw.com

3220687.4